UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | **NOT FOR PUBLICATION** |
| | : | |
| | : | Chapter 7 |
| LEBENTHAL HOLDINGS, LLC, *et al.*, | : | Case No. 17-13337 (MG) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------------x

| | | |
|---|---|---|
| | : | |
| LEBENTHAL HOLDINGS, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Pro. No. 18-01547 (MG) |
| | : | |
| SOUTH STREET SECURITIES | : | |
| HOLDINGS INC., | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------------------x

### MEMORANDUM OPINION AFTER TRIAL FINDING THAT SOUTH STREET'S TERMINATION OF THE MIPA WAS TIMELY AND THEREFORE NOT A BREACH OF THE MIPA

*A P P E A R A N C E S :*

SILVERMAN ACAMPORA LLP
*Attorneys for Plaintiff*
*Kenneth P. Silverman, Chapter 7 Trustee*
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
By:    Anthony C. Acampora, Esq.
         Gayle S. Gerson, Esq.
         Justin S. Krell, Esq.

WALFISH & FISSELL PLLC
*Attorneys for Defendant*
*South Securities Holdings Inc.*
11 Broadway, Suite 615
New York, New York 10004
By:    Rachel Penski Fissell, Esq.
         Daniel R. Walfish, Esq.

**MARTIN GLENN**
**United States Bankruptcy Judge**

Plaintiff, Kenneth P. Silverman, as chapter 7 trustee (the "Trustee" or "Plaintiff") for the jointly administered bankruptcy estate of Lebenthal Holdings, LLC ("Holdings") and its affiliated debtors[1] brought this adversary proceeding (the "Action") against South Street Securities Inc. ("South Street" or "Defendant") seeking, *inter alia*, $11.3 million in expectation damages based on New York breach of contract claims arising from South Street's termination of a Membership Interests Purchase Agreement ("MIPA") that it entered into with Holdings on March 6, 2017.

Under the MIPA, South Street planned to acquire assets of Holdings and its affiliates, subject to certain conditions. ("Joint Pretrial Order," ECF Doc. # 34, Stipulated Facts ¶¶ 12–14.)[2] One condition required Holdings to deliver to South Street in advance of closing certain 2016 financial statements and other financial documentation as set forth in the MIPA. (*See id.* ¶¶ 15–17.) According to South Street, under the terms of the MIPA, if such documentation was not satisfactory to South Street in its sole discretion, South Street could terminate the MIPA by written notice to Holdings within thirty (30) days after delivery of the financials. (*See id.*, Def.'s Cont. ¶¶ 1–4.) On May 25, 2017, South Street provided a written termination notice to Holdings after determining that the financial statements of the entities subject to the MIPA were unsatisfactory. (*See id.*, Pl.'s Cont. ¶¶ 74–75.) Holdings argues that the notice was untimely

---

[1]    In addition to Holdings, the debtors include: (i) Lebenthal Asset Management (17-13339(MG)); (ii) Lebenthal Family Office, LLC (17-13340(MG)); and (iii) Lebenthal Wealth Advisors, LLC (17-13341 (MG)) (collectively, the "Debtors").

[2]    "Joint Pretrial Order" refers to the proposed order submitted by the parties on September 13, 2019. This Court hereby enters the order.

2

and, therefore, ineffective (*see id.* ¶ 76); South Street argues that the notice was timely pursuant to the MIPA.  (*See id.*, Def.'s Cont. ¶¶ 1–4.)

The parties agreed to a trial solely on the basis of written submissions, including deposition designations and counter-designations, stipulated facts, exhibits, and trial briefs.  (*See* Stipulation and Order Regarding Pretrial Schedule and Procedure ("Pretrial Schedule and Procedure"), ECF Doc. # 32.)  The Court heard closing arguments on November 5, 2019.  Pursuant to the Pretrial Schedule and Procedure, the sole issue the Court must decide at this stage of the case is whether South Street's termination of the MIPA was untimely and therefore a breach of the MIPA.[3]  (*Id.* ¶ 1.)  For the reasons set forth below, the Court finds that South Street's termination of the MIPA was timely and therefore not a breach of the MIPA.[4]

## I.   PROCEDURAL HISTORY

On November 28, 2017, Holdings and its affiliated entities filed voluntary petitions for relief under chapter 7 of the Bankruptcy Code.  ("Petition," Case No. 17-13337, ECF Doc. # 1.)  On January 5, 2018, the Court entered an order consolidating the Debtors' cases (for procedural purposes only) and directing them to be jointly administered under the chapter 7 case of Holdings.  ("Joint Administration Order," Case No. 17-13337, ECF Doc. # 19.)

Before this chapter 7 bankruptcy case was commenced, Holdings filed a state court action captioned *Lebenthal Holdings, LLC v. South Street Securities Holdings, Inc.*, Index No.

---

[3]      The Pretrial Schedule and Procedure expressly reserved the parties' rights with respect to "whether South Street breached the Promissory Note and Pledge, dated March 10, 2017, as alleged in Count II of the Complaint, and if so, what the resulting damages are, if any."  (*Id.* ¶ 1.)  On March 23, 2018, South Street filed secured Claim No. 22 against the Holdings in an amount of "No less than $131,667.25" under a Promissory Note and Pledge, dated as of March 10, 2017.  Count II of the Complaint alleges that "South Street breached its obligations under the Note by instructing Sterling to freeze LebCo's account under the DACA in the absence of any default by Lebenthal at the time of South Street's action."  (Complaint, ECF Doc. # 1 ¶ 109.)  Nothing in this Opinion resolves any issues with respect to Count II.

[4]      The Joint Pretrial Order at 59 provides that "[i]n the event liability is established, the issue of damages will be tried separately."  Because the Court rules in favor of Defendant, the issue of damages is moot.

655450/2017 (Sherwood, J.), in the Supreme Court of the State of New York, New York County, Commercial Division (the "New York Court"). After the Trustee was appointed, he removed the Action to the District Court pursuant to 28 U.S.C. § 1334(b), and the Action was then referred to this Court.

On May 30, 2018, South Street filed a motion for abstention to remand the Action back to the New York Court pursuant to 28 U.S.C. §§ 1334(c)(1) and (2). ("Abstention Motion," ECF Doc. # 3.) On July 11, 2018, the Trustee filed an opposition ("Abstention Opposition," ECF Doc. # 7), and South Street filed a reply. ("Abstention Reply," ECF Doc. #9.) On July 27, 2018, the Court entered the Memorandum Opinion and Order denying South Street's Abstention Motion. ("Abstention Order," ECF Doc. # 11.)

On March 7, 2019, the Court entered a case management order requiring that (i) all fact discovery be completed by June 5, 2019, (ii) all expert discovery be completed by July 20, 2019, and (iii) counsel submit a joint pretrial conference order. ("Case Management Order," ECF Doc. # 19.) On June 26, 2019, the parties filed a joint status report stating that, *inter alia*, fact discovery was complete, neither party intended to offer expert testimony, and that each party intended to move for summary judgement on the same issue. ("Joint Status Report," ECF Doc. # 27.)

On July 2, 2019, the Court held a case management conference during which counsel for the parties requested leave to file cross motions for summary judgement and the Court directed counsel to file letters regarding same. (*See* ECF Doc. # 28 (letter from Defendant); ECF Doc. # 29 (letter from Plaintiff).) On July 15, 2019, after reviewing the letters, the Court concluded that cross motions for summary judgment were unlikely to provide the most effective, cost efficient and speedy procedure for resolving this case. (*See* ECF Doc. # 30.) The Court proposed that the

parties proceed to a trial solely on the basis of written submissions—including deposition

designations and counter-designations, stipulated facts and exhibits, and trial briefs—with

counsel having the opportunity for closing arguments.  (*Id.*)  Counsel were directed to advise the

Court how they wished to proceed on or before July 22, 2019.  (*Id.*)

On July 22, 2019, the parties submitted a letter and stipulation regarding pretrial

scheduling and procedure, wherein the parties agreed, *inter alia*, that the Court shall hold a trial

by paper limited to the sole issue of whether South Street's termination of the MIPA was

untimely and therefore a breach of the MIPA.  (Joint Pretrial Order ¶ 1.)

On September 13, 2019, the parties submitted a proposed joint pretrial order setting forth

stipulated facts, the parties' contentions, exhibit lists, and deposition transcripts.  (*See* Joint

Pretrial Order.)

On September 20, 2019, South Street submitted the *Trial Brief of Defendant South Street*

*Securities Holdings Inc.* ("South Street Trial Brief") and Holdings submitted *Plaintiff's Trial*

*Brief* ("Holdings Trial Brief").  (South Street Trial Brief, ECF Doc. # 35; Holdings Trial Brief,

ECF Doc. # 36.)  On October 4, 2019, the Parties submitted their respective response briefs.

("South Street Response," ECF Doc. # 37; "Holdings Response," ECF Doc. # 38.)

On October 24, 2019, the Court entered an order (the "Scheduling Order") scheduling

closing arguments in the Action to take place on November 5, 2019 at 10:00 a.m.  (Scheduling

Order, ECF Doc. # 40.)  The Scheduling Order also set forth the Court's conclusion—as both

sides had argued—"that the terms of the MIPA are clear and unambiguous and so extrinsic

evidence relating to the negotiating history will not be considered to vary or explain the terms of

the written agreement."  (*Id.* at 1.)

## II.    FACTUAL BACKGROUND

### A.  The Parties and Key Players

Lebenthal Holdings, LLC was a holding company that owned membership interests in various financial services entities.  (Joint Pretrial Order, Stipulated Facts ¶ 1.)  In the summer of 2016, Holdings retained Gordian Group, LLC ("Gordian Group"), an investment bank, to identify potential suitors and provide advisory services in connection with the sale of its subsidiaries.  (*Id.*, Pl.'s Cont. ¶ 15.)  South Street is a holding company that owns certain broker-dealers and other businesses.  (*Id.*, Stipulated Facts ¶ 8.)

In September 2016, South Street, through its retained investment bank, Pi Capital International LLC ("Pi Capital"), expressed an interest in exploring a transaction whereby South Street would acquire Holdings' 100% membership interest in (i) Lebenthal Asset Management, LLC ("LAM"), a registered investment adviser owned by Holdings, and (ii) Lebenthal Family Office, LLC ("LFO"), a small family office that was also owned by Holdings and provided certain services to wealthy individuals and families.  (*Id.* ¶¶ 2, 4.)  South Street also proposed to acquire Holdings' 49% interest in Lebenthal & Co. ("LebCo" and, together with LAM and LFO, the "Operating Entities"), a broker-dealer that was majority owned by Alexandra Lebenthal. (*Id.*, Pl.'s Cont. ¶ 17.)

Alexandra Lebenthal was Chief Executive Officer of Holdings from June 2016 through June 2017.  In June 2017, she became Chief Executive Officer and Managing Member of LebCo. (*Id.*, Def.'s Cont. ¶ 12.)  James Lebenthal, Alexandra's brother, was Chief Executive Officer of LAM until he resigned in June 2017.  (*Id.* ¶ 13.)

James Tabacchi ("Tabacchi") was South Street's Chief Executive Officer and the ultimate decision-maker as to deal terms for South Street.  (*Id.*, Pl.'s Cont. ¶¶ 25, 34.)  He also

authorized Jordan Winder ("Winder"), a Pi Capital employee, and South Street's counsel,

Milbank Tweed ("Milbank"), to negotiate the MIPA on South Street's behalf. (*Id.* ¶ 34.)

Tabacchi authorized Winder to handle, on his behalf, exchanging drafts of the MIPA and to be

Lebenthal's main point of contact. (*Id.* ¶ 35; *Id.*, Def.'s Cont. ¶ 11 (quoting Tabacchi Dep. Tr.

82–83).) David DeBlase ("DeBlase") was South Street's Chief Financial Officer. (*Id.*, Pl.'s

Cont. ¶ 25.)

Steven Collopy ("Collopy") was Holdings' Chief Financial Officer. (*Id.*, Def.'s Cont. ¶

14.) With respect to Holdings' negotiation of the MIPA, Andrew Greenstein ("Greenstein"),

Holdings' general counsel, Ashley Zambito ("Zambito"), a junior investment banker at Gordian

Group, Paul Kaufman, Gordian Group president, and Sharon Levine of Saul Ewing Arnstein &

Lehr LLP ("Saul Ewing"), handled the negotiations for Holdings. (*Id.*, Pl.'s Cont. ¶ 36.)

In April 2017, pursuant to the Accounting Assistance Letter (as defined and detailed

below), South Street's controller, Florian Jaze ("Jaze"), went to work in Holdings' offices to

assist Collopy with the preparation of certain 2016 financial statements in connection with the

MIPA and otherwise provide general accounting assistance. (*Id.* ¶¶ 62–63.) Jaze reported to

DeBlase. (*Id.*, Def.'s Cont. ¶ 8.)

**B. The MIPA**

On March 6, 2017, Holdings and South Street entered into the MIPA. (*Id.*, Stipulated

Facts ¶ 12.) Under the terms set forth in the MIPA, South Street planned to purchase all of

Holdings' membership interests in LebCo, LAM, and LFO at a closing date to be determined.

(*Id.* ¶ 14.) Section 5.2(g) of the MIPA provides, in pertinent part, as follows:

> [South Street] shall have received, no later than April 15, 2017,
> copies of (i) the unaudited financial statements of LAM and LFO
> for the period beginning January 1, 2016 and ended December 31,
> 2016 and (ii) the audited financial statements of [LebCo] for the

> period beginning January 1, 2016 and ended December 31, 2016 ((i)
> and (ii) together, the "2016 Financial Statements"), including the
> unqualified opinion addressed to [LebCo] from Grant Thornton LLP
> (the "Audit Report"), confirming that it has audited in accordance
> with the standards of the Public Company Accounting Oversight
> Board (United States) the 2016 financial statements; . . . .

(MIPA, Art. V, § 5.2(g).)

Section 7.1(g) of the MIPA provides, in pertinent part, as follows:

> [The MIPA] may be terminated in writing at any time prior to the
> Closing Date, "by [South Street], by written notice to [Holdings]
> within thirty (30) days after delivery of the 2016 Financial
> Statements, Audit Report and financial results therein contemplated
> by Section 5.2(g), if such 2016 Financial Statements, Audit Report
> and financial results therein are not satisfactory to [South Street] in
> its absolute discretion."

(MIPA, Art. VII, § 7.1(g).)  To be sure, section 5.2(g) defines "2016 Financial Statements" as (i)

"the unaudited financial statements of LAM and LFO for the period beginning January 1, 2016

and ended December 31, 2016, and (ii) the audited financial statements of [LebCo] for the period

beginning January 1, 2016 and ended December 31, 2016."  (MIPA, Art. V, § 5.2(g).)  Section

5.2(g) defines "Audit Report" as "the unqualified opinion addressed to [LebCo] from Grant

Thornton LLP."  (*Id.*)

Section 9.4 of the MIPA provides, in pertinent part, as follows:

> No amendment, modification or discharge of this Agreement, and
> no waiver under this Agreement, shall be valid or binding unless set
> forth in writing and duly executed by the Party against which
> enforcement of the amendment, modification, discharge or waiver
> is sought.  Any such waiver shall constitute a waiver only with
> respect to the specific matter described in such writing and shall in
> no way impair the rights of the Party granting such waiver in any
> other respect or at any other time. . . .

(MIPA, Art. IX, § 9.4.)

### C. Financial Statements

On March 20, 2017, Collopy, Holdings' Chief Financial Officer, sent to Thomas Miller, a South Street employee, an email attaching, *inter alia*, (a) Excel workbooks containing data extracted from QuickBooks, and bearing the filenames: (i) "2016 LFO-Balance Sheet.xlsx"; (ii) "2016 LFO – Profit and Loss.xlsx"; and (iii) "Transaction List by Date – 2016"; and (b) PDF files bearing the filenames: (i) "Dec 2016 – LFO Accounts Payable.pdf"; and (ii) "Dec 2016-LFO Profit and Loss.pdf" (collectively, the "LFO March Financials"). (Joint Pretrial Order, Stipulated Facts ¶ 18.)

On March 29, 2017, Collopy sent to DeBlase, South Street's Chief Financial Officer, an email attaching, *inter alia*, (a) Excel workbooks containing data extracted from QuickBooks and bearing the filenames: (i) "2016 – Lebenthal_Asset Management_LLC Balance Sheet.xlsx"; (ii) "2016 - Lebenthal_Asset_Management_LLC Profit and Loss.xlsx"; (iii) "2016 – Lebenthal_Asset_Management_LLC  Profit and Loss by Quarter.xlsx"; (iv) "2016 - Lebenthal_Asset_Management_LLC Transaction Detail.xlsx"; and (v) "2016 - Lebenthal_Asset_Management_LLC Trial Balance.xlsx"; and (b) PDF files bearing the filenames: (i) "2016 – Lebenthal_Asset_Management_LLC Balance Sheet.pdf"; and (ii) "2016 – Lebenthal_Asset_Management_LLC Profit and Loss.pdf" (collectively, the "LAM March Financials," and together with the LFO March Financials, the "March Financials"). (*Id.* ¶ 19.)

On April 12, 2017, Holdings and South Street executed a letter agreement (the "Accounting Assistance Letter") regarding certain assistance that South Street agreed to provide to Holdings. The Accounting Assistance Letter provided that:

> Pursuant to Section 5.2 of the [MIPA] [Holdings] is obligated to deliver to [South Street] by no later than April 15, 2017 copies of the 2016 Financial Statements, including the Audit Report. *At this time, [Holdings] and [LebCo, LAM, and LFO] lack the resources,*

> *expertise and capacity to prepare and maintain the books and*
> *records, financial reports and financial statements required in order*
> *to deliver the 2016 Financial Statements and to otherwise operate*
> *Lebenthal Businesses. Therefore, [Holdings] requests that [South*
> *Street] assist [Holdings] in completing the 2016 Financial*
> *Statements* and otherwise maintaining and preparing its accounting
> and financial books and records *by providing accounting assistance,*
> *including the closing of books, preparation and review of journal*
> *entries and supporting information, preparation of financial*
> *statements and reports and other accounting duties* (any of such
> services, the "Accounting Assistance").

(Joint Pretrial Order, Stipulated Facts ¶ 20 (emphasis added).)

On April 18, 2017, Collopy sent to DeBlase an email attaching, *inter alia*, files bearing

the names (i) "Lebenthal 2016 statement of financial condition-final.pdf"; (ii) "Lebenthal 2016

financial statements Long Form – final.pdf"; and (iii) "SEC delivery receipt 2016 Financial

Statements.pdf" (collectively, the "LebCo Audit Report"). (*Id.* ¶ 21.)

On April 26, 2017, Collopy sent to DeBlase an email attaching, *inter alia*, (i) a revised

version of the LAM March Financials (the "LAM April Financials"); (ii) a revised version of the

LFO March Financials (the "LFO April Financials," and together with the LAM April

Financials, the "April Financials"); and (iii) excel workbooks containing data extracted from

QuickBooks and bearing the file names: (a) "Dec 2016 – Lebenthal Holdings Balance Sheet  4-

25-17.xlsx"; (viii) "Dec 2017 – Lebenthal Holdings General Ledger 4-25-17.xlsx"; (ix) "Dec

2016 – Lebenthal Holdings Profit and Loss 4-25-17"; (x) "Dec 2017 – Lebenthal Holdings Trial

Balance 4-25-17.xlsx"; and (xi) "Dec 2016 – Lebenthal Combined BS and PL 4-25-17.xlsx"

(collectively, the "Holdings Financials"). (*Id.* ¶ 23.)

A comparison of the March Financials and the April Financials reveals that certain

changes were made by Holdings. First, the LFO April Financials reflect a $100,000 increase in

amounts due to LFO from LAM, and a decrease of approximately $92,000 in amounts from LFO

to Holdings. (*See id.* ¶¶ 24–25; *id.*, Def.'s Cont. ¶ 76.) Second, the LAM April Financials

reflect the addition of a $25,000 debt owed to LAM from LebCo, a $5,700 reduction in debt of

Holdings due to LAM, and an 11% drop in LAM's assets with a slight increase in net income.

(*See id.* ¶¶ 26–27; *id.* Def.'s Cont. ¶¶ 77–78.)

On May 25, 2017, South Street delivered to Holdings a notice stating that South Street

"hereby terminates the [MIPA] pursuant to Section 7.1(g) of the [MIPA] due to the fact that

[South Street] has determined in its absolute and sole discretion that the 2016 Financial

Statements, Audit Report and financial results therein are not satisfactory to the Purchaser." (*See*

*id.* ¶ 28.)

### III.    THE PARTIES' CONTENTIONS

#### A.  South Street Trial Brief

South Street's Trial Brief urges the Court to begin its analysis with the plain language of

the MIPA.  (South Street Trial Brief at 6.)  Section 5.2(g) of the MIPA required Holdings to

deliver to South Street "the 2016 Financial Statements," which were defined as "***the*** unaudited

financial statements of LAM and LFO."  (*Id.*) (emphasis in original).  South Street maintains that

the drafters' choice to use a limiting article, "the," to precede "unaudited financial statements"

indicates that Holdings had to deliver the final, completed, and most updated financial

statements.  (*Id.* at 7.)  Under this reasoning, the April Financials were the singular, definitive,

unaudited financial statements referred to in the MIPA because they were the last and most

complete versions sent to South Street.  (*Id.* at 11.)  They were also meaningfully different from

March Financials.  (*Id.*)

South Street points to extrinsic evidence regarding the parties' course of conduct showing

that South Street timely terminated the MIPA.  (*Id.* at 8.)  South Street references the Accounting

Assistance Letter in which Holdings acknowledged that the 2016 Financial Statements were not

complete and had not been delivered. (*Id.*) South Street also points to email correspondence

with Holdings' key executives and advisor acknowledging that the April 26 delivery date of the

April Financials triggered the 30-day clock. (*Id.*) Lastly, between May 2 and May 24, several

drafts of a closing checklist were widely disseminated and those closing checklists listed May 25

as the termination date. (*Id.*) In spite of these facts, no one at Holdings disputed that termination

date, challenged South Street's termination notice as defective, or moved to enjoin South Street

to close the transaction. (*Id.*)

South Street also raises a waiver and estoppel defense, arguing that Holdings knowingly,

voluntarily, and intentionally abandoned any right to claim that the March Financials were "the

unaudited financial statements" contemplated by the MIPA. (*Id.* at 22–23.) No one at Holdings

told South Street that it had to terminate the MIPA by May 17 or lose its termination rights under

section 7.1(g). (*Id.* at 23.) After May 25, no one from Holdings indicated that South Street's

termination was defective. (*Id.*) Relying on Holdings' actions and failures to act, South Street

did not terminate earlier, seek an extension to a later date, assert a different basis for termination,

or refuse to close because other closing conditions had not yet been met. (*Id.*)

### B. Holdings Trial Brief

Holdings argues that, contrary to Second Circuit case law, South Street impermissibly re-

writes the MIPA to render the heavily negotiated 30-day termination provision meaningless.

(Holdings Trial Brief at 5–6.) (citing *Metropolitan Life Ins. Co. v. RJR Nabisco Inc*., 906 F.2d

884, 889 (2d Cir. 1990)). According to Holdings, as per the terms of the MIPA, once Holdings

delivered the specified financial statements—regardless of the veracity or completeness of those

financial statements—South Street had 30 days to terminate the deal. (*Id.* at 6, 20–21.) There is

no requirement in the MIPA stating that the financial statements needed to be

"final." (*Id.*) Holdings contends that the Court should be precluded from interpreting an agreement to state something that the parties neglected to include. (*Id.* at 22.)

Further, South Street's position would impermissibly allow it to act as an arbiter of when financial statements pursuant to MIPA section 5.2(g) are sufficiently "final" thereby unilaterally controlling when the 30-day period in section 7.1(g) starts to run. (*Id.* at 23.) Accordingly, Holdings argues that South Street's termination was untimely under the MIPA. (*Id.* at 20.)

### C. South Street Response

South Street maintains that its core argument is not that the deadline for termination under section 7.1(g) was eliminated. Rather, the dispute concerns which date—April 18, 2017 or April 26, 2017—triggered the 30-day clock to terminate the MIPA. (South Street Response at 4.) Holdings' papers offer no justification for why the March Financials, not the April Financials, satisfied the delivery obligation. (*Id.* at 4–5.) Under Holdings' theory, the delivery obligation in the MIPA could be satisfied as long as the transmitted files were labelled "2016 financial statements," "regardless of the veracity or completeness of those financial statements." (*Id.* at 6 (citing Holdings Trial Brief at 2).) Such an argument would allow Holdings to have unfettered discretion to determine when and whether the 30-day clock would run, and to re-write the terms of the MIPA, eliminating the word "the" preceding 2016 Financial Statements and converting it to "any." (*Id.* at 6.)

South Street does not argue, as Holdings contends, that it could unilaterally determine when the 30-day clock started. (*Id.* at 7.) Rather, South Street's position is that a termination deadline existed under the MIPA and it complied with that deadline. (*Id.*) Similarly, South Street does not argue that the parties intended for Holdings' financials to be included in the MIPA's definition of "2016 Financial Statements." (*Id.*) However, their inclusion in the

13

delivery of April Financials on April 26 statements (when they were absent from delivery of the March Financials) supports the view that the April Financials were the applicable statements. (*Id*.)  South Street also contends that Holdings does not even attempt to address its argument that the definite article "the" preceding unaudited financial statements required Holdings to deliver a particularized, singular, definitive version of those statements.  (*Id*. at 9.)

### D.  Holdings Response

Holdings takes issue with South Street's description of the April Financials as "meaningfully different" than the March Financials.  (Holdings Response at 5.)  Holdings maintains that the differences between the original and modified versions are insignificant.  (*Id*. at 6.)

Holdings also argues that the MIPA imposed a definitive starting point for delivery of the financial statements and ending point when South Street could terminate the contract.  (*Id*. at 8.) After Holdings delivered the LFO March Financials, LAM March Financials, and LebCo Audit Report on March 20, March 29, and April 18, 2017, respectively, the parties engaged in an iterative process whereby Holdings continued to provide South Street with financial information as it became available.  (*Id*. at 7.)  Thus, under South Street's reasoning, the starting gate to trigger section 7.1(g) would continue to move, rendering the 30-day clock meaningless.  (*Id*. at 8.)

Holdings points to emails and an early draft of the closing checklist showing that South Street understood that May 17, 2017 was South Street's deadline to terminate its agreement.  (*Id*. at 11.)  The MIPA can only be modified by a writing, signed by the parties to be bound under section 9.4.  (*Id*. at 12.)  As such, South Street cannot now argue that the MIPA was modified by an email from Zambito, who responded to Winder's email concerning modified termination

deadlines by stating, "Understood." (*Id*. at 12.) Holdings also cites to deposition testimony indicating that Zambito is "very junior" and did not have the authority to make legally binding decisions on behalf of Holdings. (*Id*.)

## IV.    JURISDICTION AND VENUE

The Court has subject matter jurisdiction under 28 U.S.C. §§ 157 and 1334(b). Venue of this adversary proceeding is proper under 28 U.S.C. § 1409(a). This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Both parties have consented to the bankruptcy court entering final orders and judgments. (Joint Pretrial Order, Stipulated Facts II.)

This opinion sets forth the Court's findings of fact and conclusions of law pursuant to Rule 52(a) and (c) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## V.    LEGAL STANDARD

### A.  Modification of a Contract

New York law permits parties to modify a contract "by another agreement, by course of performance, or by conduct amounting to waiver or estoppel." *Kaplan v. Old Mut. PLC*, 526 F. App'x 70, 72 (2d Cir. 2013) (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 783 (2d Cir. 2003)). "Contract modification requires proof of each element requisite to the formation of a contract, including a 'manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" *Kaplan*, 526 F. App'x at 72 (quoting *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp*., 93 N.Y.2d 584, 589 (1999)).

1.  <u>Modification by a Signed Writing</u>

Section 15-301 of New York General Obligations Law governs prohibitions against oral modifications in a contract.  *See* N.Y. Gen. Oblig. Law § 15-301 ("A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."). Pursuant to section 15-301, "[w]here a contract prohibits oral modifications, any subsequent modification must not only be in writing, but also must be signed by the party against whom enforcement is sought."  *Stanley Works Israel Ltd. v. 500 Grp., Inc*., 332 F. Supp. 3d 488, 503 (D. Conn. 2018) (applying New York law).

In New York, signed electronic communications between parties are sufficient to modify contract terms.  *See Stevens v. Publicis, S.A.*, 50 A.D.3d 253, 255 (1st Dep't 2008) (holding that the lower court properly relied on email exchanges "to modify plaintiff's duties under the employment agreement").  In this regard, *Ion Audio, LLC v. Bed, Bath & Beyond, Inc*., 15-CV-8292(KMW), 2019 WL 1494398 (S.D.N.Y. Apr. 2, 2019), is instructive.  There, Ion developed and sold consumer electronics to Bed, Bath & Beyond ("BB&B") pursuant to a Vendor Compliance Guide and various addenda.  *Id.* at *1.  Ion argued that BB&B breached the contract by miscalculating the permitted volume rebate under the agreements.  BB&B defended the breach of contract claim by contending that an email exchange between the parties modified the volume rebate terms.  *Id.* at *3.  Pursuant to the email exchange, BB&B modified the volume rebate provision under the original contract, and Ion responded "confirmed."  *Id.*  The court found that the email exchanges, with a signature block, containing the typed name and title of the representative from BB&B and Ion, were sufficient to modify the contract.  *Id.*

16

Similarly, in *Stanley Works Israel Ltd.*, 332 F.Supp.3d at 503, the parties entered into a settlement agreement whereby plaintiff agreed to wire a sum of ten million dollars to defendant to resolve a dispute over license agreements.  Pursuant to subsequent signed electronic communications, however, plaintiff planned to withhold $600,000 of the agreed settlement amount and remit it to the relevant tax authorities.  *Id.* at 496.  Plaintiff thereafter erroneously transferred the full ten million dollars to defendant's bank account and subsequently brought suit arguing that defendant should return $600,000 in mistakenly transferred funds under the modified contract.  Although withholding $600,000 for tax purposes was not provided for in the original settlement agreement, plaintiff argued that the parties modified the contract terms through their electronic correspondence.  *Id.* at 501.  The court found that "Plaintiff plausibly alleges that through the exchange of signed electronic writings—or emails—after the execution of the Settlement Agreement, the parties modified the Agreement to account for the withholding of funds for tax purposes" and agreed that due to the "mistaken overpayment . . . Defendants would return the money."  *Id.* at 504.

Nevertheless, courts will enforce oral modifications without an accompanying signed writing where there has been partial performance or reliance.  *See Gun Hill Road Servs. Station, Inc. v. ExxonMobil Oil Corp.*, No. 08 Civ. 7956(PKC), 2013 WL 395096, at *5 (S.D.N.Y. Feb. 1, 2013).  The subsequent performance or reliance must be "unequivocally referable to the modification."  *John Street Leasehold LLC v. F.D.I.C.*, 196 F.3d 379, 382 (2d Cir. 1999) (quoting *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990)).  "In this scenario, a court may consider past oral exchanges and the conduct of the parties to explain the nature and extent of the modification."  *Mooney v. AXA Advisors, L.L.C.*, 19 F. Supp. 3d 486, 504 (S.D.N.Y. 2014).

17

2. Modification by Waiver

New York law permits parties to "knowingly, voluntarily and intentionally" abandon their contract rights by waiver. *See Fund'l Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,* 7 N.Y.3d 96, 104 (2006). Waiver is evidenced by "affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." *Id.* (internal citations and quotations omitted). "Although waivers are not lightly presumed, whether a party intends to waive a contractual right is generally a question of fact." *Williams v. Buffalo Pub. Sch.*, 758 F. App'x 59, 63 (2d Cir. 2018) (internal quotations and citations omitted). Courts maintain that the presence of a non-waiver clause "does not preclude a contract from being 'effectively modified by actual performance and the parties' course of conduct.'" *1301 Prop. Owner LP v. Abelson*, No. 653342/2013, 37 N.Y.S.3d 207, at *5 (N.Y. Sup. Ct. Apr. 1, 2016) (quoting *Aiello v. Burns Int'l Sec. Servs. Corp.*, 110 A.D.3d 234, 245 (1st Dep't 2013)).

In *JMC Rest. Holdings LLC v. Pevida*, 14 Civ. 6157(WFK)(VMS), 2017 WL 6418939 (E.D.N.Y. Sept. 28, 2017), the court considered whether defendants waived a deadline to a settlement stipulation. The stipulation provided that negotiations between the parties over a lease needed to be concluded within sixty days of executing the settlement agreement, otherwise the substantive settlement obligations would not be enforced. The parties disagreed about whether the lease was signed within the negotiation period contemplated by the settlement agreement, or whether the period was extended. The court found that defendants waived "any right to invoke the [earlier] deadline" because defendants' counsel had requested through email communications an extension of the negotiation deadline and requested a stay to sign the lease while his clients were out of town. *See id.* at *7. Such conduct waived defendants' right to invoke the earlier deadline. *See id.* The court also noted that the request for "an extension combined with

18

Plaintiffs' course of conduct in signing the [lease] on the [later date], modified the Stipulation to extend the duration of" the negotiating period. *See id.* at 6 n.6.

## VI.    DISCUSSION

### A.  The March Financials Were Not the 2016 Unaudited Financial Statements Contemplated by the MIPA

The Court finds that the March Financials were not the 2016 unaudited financial statements of LAM and LFO that were required for section 5.2(g) of the MIPA to be satisfied. Rather, the 2016 unaudited financial statements contemplated by the MIPA were delivered on April 26, 2017—*i.e.*, the April Financials.  Thus, South Street's termination on May 25, 2017, was timely because it was within the 30-day window specified in section 7.1(g).

#### 1.  Delivery of the March Financials

On March 20, 2017, Collopy sent Thomas Miller, a South Street employee, an email attaching the LFO March Financials.  (Joint Pretrial Order, Stipulated Facts ¶ 18.)  On March 29, 2017, Collopy sent an email to DeBlase attaching the LAM March Financials.  (*Id.* ¶ 19.)

This Court finds persuasive DeBlase's testimony that he and Collopy had a clear understanding that the March Financials were not the ones contemplated by the MIPA because Collopy was still reconciling Holdings' intercompany balances.  (DeBlase Dep. Tr. at 119:14–121:18; 124:19–125:8.)  DeBlase testified that the financial statements were sent in an iterative fashion.  The March Financials were "just like another draft of all other e-mails that [Collopy] had given [South Street] with the financials . . . ."  (*Id.* at 119:21–25.)  However, he did not understand the March Financials to be "the final financials."  (*Id.* at 119:24–25.)  Instead, he viewed them as a draft because Collopy was still working on reconciling intercompany transfers and balances.  (*Id.* at 120:22–121:24; 124:24–125:8.)

19

## 2.    The Accounting Assistance Letter

On April 10, 2017, James Lebenthal emailed Tabacchi to discuss recent accounting issues.  (DX-56 (Lebenthal April 10 Email).)  He explained that Goldstein and Alexandra Lebenthal are aware of these accounting issues.  (*Id.*)  The accounting difficulties were also relayed to Holdings' board of directors, who "weren't happy . . . with the pace and production being done by Steve Collopy as far as getting the financial statements completed, and so they had decided to ask for assistance as part of the process."  (*Id.*; Greenstein Dep. Tr. at 155:5–13.) Further, an email correspondence on March 5, 2017 from Collopy to DeBlase reveals that Holdings needed an extension to complete the LebCo audit due to an upcoming move and shortage of staff.  (DX-43 (Collopy March 5 Email).)

In response to the accounting problems at Holdings, South Street agreed to provide Holdings with accounting assistance.  (DX-57 (Winder April 11 Email).)  To that end, on April 12, 2017, Holdings and South Street executed the Accounting Assistance Letter.  As previously stated, the Accounting Assistance Letter provided that:

> Pursuant to Section 5.2 of the [MIPA] [Holdings] is obligated to deliver to [South Street] by no later than April 15, 2017 copies of the 2016 Financial Statements, including the Audit Report.  At this time, [Holdings] and [LebCo, LAM, and LFO] lack the resources, expertise and capacity to prepare and maintain the books and records, financial reports and financial statements required in order to deliver the 2016 Financial Statements and to otherwise operate Lebenthal Businesses.  Therefore, [Holdings] requests that [South Street] assist [Holdings] in completing the 2016 Financial Statements and otherwise maintaining and preparing its accounting and financial books and records by providing accounting assistance, including the closing of books, preparation and review of journal entries and supporting information, preparation of financial statements and reports and other accounting duties (any of such services, the "Accounting Assistance").

(Joint Pretrial Order, Stipulated Facts ¶ 20.)

20

The Court finds that pursuant to the Accounting Assistance Letter, South Street agreed to provide Holdings with a South Street employee, Jaze, who could provide accounting assistance. (Joint Pretrial Order, Pl.'s Cont. ¶ 63; Tabacchi Dep. Tr. at 114:3–14.)  Holdings prepared for Jaze's arrival and tried to ensure "proper positioning and an orderly transition."  (DX-13 (Greenstein April 12 Email).)  Collopy recalled that Jaze worked at Holdings' offices for more than two weeks and less than two months.  (Collopy Dep. Tr. at 107:7–13.)  Jaze's accounting support included helping with preparing historical financials, journal entries, and with transitioning knowledge to make him better at his job when he took over.  (Collopy Dep. Tr. at 138:11–139:12.)  The Accounting Assistance Letter, and related emails and deposition testimony thus demonstrate that the financial statements contemplated under the MIPA were not delivered in March.

### 3.  Delivery of the April Financials

On April 14, 2017, Collopy received the LebCo Audit Report that was completed by Grant Thornton LLP.  (JX-17 (Integrated Solutions April 14 Email).)  On April 18, 2017, Collopy sent the LebCo Audit Report to DeBlase.  (JX-17 (Collopy April 18 Email).[5])

On April 25, 2017, Collopy sent Zambito the April Financials for her to review.  (DX-62 (Collopy April 25 Email).)  Zambito's reply email highlights the changes made to the April Financials, and Zambito also remarks that "Intercos are pretty different from 2016 provided earlier," in reference to the intercompany debts owed to/from LFO.  (DX-62 (Zambito April 25 Email).)

As previously stated, a comparison of the March Financials and the April Financials reveals that certain changes were made by Holdings.  First, the LFO April Financials reflect a

---

[5]      Defendant objected to JX-17 as hearsay (FRE 801).  The objection is overruled.

$100,000 increase in amounts due to LFO from LAM and a decrease of approximately $92,000 in amounts from LFO to Holdings. (Joint Pretrial Order, Stipulated Facts ¶¶ 24–25; *id.*, Def.'s Cont. ¶ 76.) Second, the LAM April Financials reflect the addition of a $25,000 debt owed to LAM from LebCo, a $5,700 reduction in debt of Holdings due to LAM, and an 11% drop in LAM's assets with a slight increase in net income. (*See id.* ¶¶ 26–27; *id.*, Def.'s Cont. ¶¶ 77– 78.)

By email dated April 26, 2017, Collopy sent DeBlase the Holdings Financials and the April Financials, explaining that there had been "a few minor P&L adjustments to LAM & LFO so [he was] resending everything." (JX-9 (Collopy April 26 Email).[6])

### 4. Communications Between the Parties Prior to South Street's Termination

Communications between the parties before South Street's termination of the MIPA reveal a mutual understanding that the March Financials were not the 2016 unaudited financial statements of LAM and LFO contemplated by the MIPA. As previously stated, on April 26, 2017, Collopy emailed DeBlase, Jaze, Winder and Zambito, attaching the Holdings' Financials and the April Financials. On May 2, 2017, Winder replied to the email, writing to DeBlase that based on the attachments that Collopy sent, April 26 started the 30-day clock for South Street to respond regarding the LAM and LFO (giving South Street until May 25 to respond).[7] (JX-18 (Winder May 2 Email).) DeBlase did not respond to Winder challenging the May 25 deadline.

Later on May 2, 2017, Winder forwarded to Zambito a "draft closing checklist." (JX-19 (Winder May 2 Email).) The first column at Item 20 on the checklist stated, "Seller to deliver to

---

[6]     Defendant objected to JX-9 as hearsay (FRE 801). The objection is overruled.

[7]     Winder appeared to incorrectly think that there were two deadlines, when he noted in the email that the LebCo's audit was received on April 18, and therefore the deadline for South Street to respond regarding LebCo would be May 18. (JX-18.) However, this error does not bear upon the clear understanding in the email that South Street had thirty days from when the LAM and LFO were submitted on April 26 to terminate.

Purchaser the 2016 Financial Statements (§5.2(g))."  The "status" column at Item 20 stated,

"Agreement may be terminated by Purchaser for unsatisfactory 2016 Financial Statements and

Audit Report by 5/17/17."  (*Id.*)  This is the only May transmission of the checklist from South

Street to Holdings, in evidence, that specifies May 17 as the termination deadline.  Zambito

responded to Winder, stating that "[t]he 2016 financials were submitted last week.  Those can be

considered complete unless you have questions." (DX-14 (Zambito May 2 Email).)  Zambito's

response confirms that Holdings sent the completed 2016 financials on April 26.

On May 3, 2017, Zambito separately sent Winder the 2016 financials, to which Winder

responded: "[s]ince the Holdings numbers came through on 4/26 as you note below, LAM and

LFO have another week" (DX-64 (Winder May 3 Email)); Zambito responded "Understood."

(*Id.* (Zambito May 3 Email).)  Zambito's response, on behalf of Holdings, is an affirmation of

Winder's statement.  (*Id.*)  Thus, the Court does not find persuasive Holding's argument that

South Street never "communicate[d] to Holdings that it deemed its time to terminate to be

extended to May 25, 2017."  (Joint Pretrial Order, Pl.'s Cont. ¶ 68.)

In all later communications, the closing checklist included May 25 as the termination

date, and Holdings agents did not contest the May 25 termination date.  In several email

exchanges between Holdings and South Street, the checklist was circulated, yet Holdings at no

time mentioned the May 25 termination date.  For example, on May 15, Milbank sent the

checklist with the May 25 termination date via email to Winder and Zambito to be discussed on a

May 16 call.  (DX-66 (Milbank May 15 Email).)  On May 16, Zambito sent the closing checklist

to Greenstein, General Counsel at Holdings, without commenting on the May 25 date.  (DX-15

(Zambito May 16 Email).)  On May 24, a Milbank attorney sent to Winder and Greenstein and

others an updated closing checklist with a red line of changes, but the May 25 termination date

remained.  (DX-18 (Milbank May 24 Email).)  Similarly, a Milbank attorney on May 19 sent

"the latest draft of the Closing Checklist," to discuss on a call, yet no emails were sent in

response regarding the May 25 date. (DX-72 (Milbank May 19 Email).)  Indeed, on May 17,

Winder asked Zambito to "mark[] up the closing checklist with the few items" she had

mentioned to Winder the previous day.  (DX-70 (Zambito May 17 Email).)  Yet, Zambito did not

contest the May 25 date in the attachment or email.

Further, emails between Collopy, Greenstein and Zambito indicate that Holdings did not

consider the termination deadline to be May 17.  For example, Zambito, in an email dated May

18, 2017, one day after the alleged May 17 deadline, asked Collopy "[w]hat about the closing

balance sheet and getting approval on the financials?"  (DX-71 (Zambito May 18 Email).)

Further, on August 16, 2017, in an email to Murray, Greenstein and Zambito, Collopy makes

clear that the final version of the financial statements was submitted in April: "[e]ven though we

gave the final info in April, [South Street] was giving information all along." (DX-86 (Collopy

August 16 Email).)  In none of these instances, did Holdings' agents mention an earlier date to

start the 30-day clock contemplated by the MIPA.

5.  <u>Deposition Testimony Regarding the May 25 Termination Date</u>

Deposition testimony further reflects that South Street repeatedly communicated the May

25 termination date to Holdings and that such communications were not disputed by Holdings.

Tabacchi testified that he told all the principals at Holdings, including Alexandra and James

Lebenthal, that May 25th was the termination date.  (Tabacchi Dep. Tr. at 123:17–124:2.)  He

believes that both parties understood that May 25th was the deadline because around May 1st or

May 2nd he "told them pointedly, if [he] can't resolve this by noon on May 25th, we're done."

(*Id.* at 124:19–125:3.)

Tabacchi testified that even though he raised the May 25th date with several individuals at Holdings, none of them contested it. (*Id.* at 126:6–9.) Greenstein confirmed that Tabacchi had mentioned the May 25th termination date twice, including at Holdings' offices in front of a large group. (Greenstein Dep. Tr. 163:9–164:2; 164:3–165:19[8]; 175:7–13.) After Tabacchi relayed the May 25th date, Greenstein testified that he looked at the MIPA and saw the termination provision. (*Id.* at 176:3–8.) He discussed the termination provision with Alexandra Lebenthal, James Lebenthal, Steve Collopy, and potentially Ashley Zambito. (*Id.* at 176:13–177:20.) However, no action by any of those individuals was subsequently taken.

### 6. Post-Termination Acquiescence

No actions were taken by Holdings post-termination of the MIPA to contest South Street's actions. Holdings did not claim South Street's notice was defective. Instead, following South Street's termination, Greenstein developed a document detailing potential claims that could be filed against each party in the case. The document does not indicate that Holdings was considering a claim against South Street for untimely termination. (DX-22 (Lebenthal Litigation Strategy, Potential Claims)[9].) Similarly, on July 27, 2017, Greenstein provided Zambito with a "Timeline of Events" he created. (DX-23 (Lebenthal Litigation Strategy, Timeline of Events).[10]) The timeline indicates that South Street "terminate[d] the transaction claiming lack of confidence in the financials and performance." (*Id.*) Absent from the timeline, however, is any indication that South Street's termination was untimely or improper. (*Id.*)

---

[8]    Plaintiff objected to this testimony as hearsay. The objection is overruled.

[9]    Plaintiff objected to DX-22 on the basis of relevance (FRE 402), hearsay (FRE 801), improper authentication (FRE 901), prejudice, confusion and waste of time (FRE 403). The objections are overruled.

[10]    Plaintiff objected to DX-23 on the basis of relevance (FRE 402), hearsay (FRE 801), hearsay within hearsay (FRE 805.) The objections are overruled.

In addition, on August 16, in another email responding to Holdings' attorney regarding litigation strategy about the timeline of delivery, Greenstein wrote that "[t]he actual unaudited trial balances and P&L for 2016 were not completed until late April." (DX-87 (Greenstein August 16 Email).) The May email correspondence, together with deposition testimony and Holdings' emails regarding litigation strategy, clearly illustrate that the May 25 deadline was contemplated by both parties as the deadline for South Street to terminate the Agreement.

In summary, the Court is persuaded that the following facts establish by a preponderance of the evidence that May 25, 2017 was the MIPA termination deadline: (i) DeBlase's testimony that he viewed the March Financials as a draft because Collopy was still working on reconciling intercompany transfers; (ii) the timing and nature of the Accounting Assistance letter; (iii) the meaningful changes made to the April Financials; (iv) multiple versions of the closing checklist state that May 25, 2017 was the termination date; (v) the testimony of Tabacci and Greenstein that the May 25th termination date was raised with several key players at Holdings, but not one of them contested it; and (vi) Holdings took no actions post-termination to contest the actions of South Street. Therefore, the Court finds by a preponderance of the evidence that South Street's termination of the MIPA was timely and, accordingly, not a breach of the MIPA.

### B. Even if the March Financials Were the Financials Required By the MIPA, Holdings' Conduct and Communications Modified the May 17 Termination Deadline

Even if the March Financials were the 2016 unaudited financials of LAM and LFO contemplated by the MIPA, such that delivery of the LebCo Audit Report on April 18 started the 30-day clock for South Street to exercise its termination rights, this Court finds that Holdings' conduct and communications with South Street modified the termination deadline from May 17 to May 25. New York law permits parties to modify a contract "by another agreement, by course

of performance, or by conduct amounting to waiver or estoppel." *Kaplan*, 526 F. App'x at 72

(quoting *Dallas Aerospace, Inc*., 352 F.3d at 783). Holdings modified the May 17 termination

date to May 25 through signed writings and waiver.

As a threshold matter, this Court finds that Zambito did have authority to make legally

binding decisions on behalf of Holdings. Holdings' employees made clear Zambito's authority

vis-à-vis her interaction with South Street. For example, in an email on August 16, Collopy

wrote that Zambito "is the focal point of information with [South Street]." (DX-86 (Collopy

August 16 Email). In Greenstein's deposition, Greenstein acknowledged that "Zambito was

authorized to act on Holdings' behalf when dealing with Pi Capital issues." (Greenstein Dep. Tr.

50:20–51:2.) South Street hired Pi Capital specifically to work on the contract between Holdings

and South Street.

Email communications between Zambito and South Street demonstrate that the parties

intended to extend the May 17 termination date triggered by Holdings' delivery of the LebCo

Audit Report on April 18. In *Ion Audio, LLC,* 2019 WL 1494398, the court found persuasive

email exchanges where defendant modified a volume rebate provision to a contract, and plaintiff

responded "confirmed." *Id.* at *3. Here, the email communications between both parties also

evidence that they understood May 25 to be South Street's deadline to terminate the agreement.

(*See* DX-64 (Winder and Zambito Correspondence).) On May 3, 2017, Winder emailed Zambito

regarding Lebenthal Entities 2016 P&L, BS and other data. Winder references a closing

checklist sent on May 2, 2017, which lists South Street's termination date as May 17, 2017. She

writes: "The way they reflected it in the checklist is that South Street needs to say something by

5/17, which is 30 days from when the [LebCo] audit came through. Since the Holdings numbers

came through on 4/26 as you note below, LAM and LFO have another week." (*Id*.) Zambito,

who had the authority to bind Holdings, agrees with Winder's extension of the termination

deadline and responds: "Understood.  Thank you."  (*Id.*)  Consistent with Zambito and Winder's

email exchange, all subsequent drafts of the closing checklist prepared by Zambito and

exchanged between the parties reflected the May 25 termination date.  (DX-15 (Zambito May 16

Email); DX-18 (Milbank May 18 Email); DX-66 (Milbank May 15); DX-70 (Zambito May 17

Email); DX-72 (Milbank May 19 Email).)  No one at Holdings ever questioned the May 25

reflected on the closing checklist.

      The Court finds that a preponderance of the evidence establishes that Holdings waived

the ability to rely on the earlier May 17 termination date.  New York law permits parties to

"knowingly, voluntarily and intentionally" abandon their rights under a contract by waiver.

*Fund'l Portfolio Advisors, Inc.,* 7 N.Y.3d at 104.  *JMC Restaurant Holdings LLC*, 2017 WL

6418939, is instructive in this regard.  Where parties disagreed about deadlines contemplated

under a stipulation, the court found that defendants waived "any right to invoke the [earlier]

deadline" because defendants' counsel had requested through email communications an

extension of the negotiation deadline and requested a stay to sign the lease while his clients were

out of town.  *See id.* at *7.  Such conduct therefore waived defendants' right to invoke the earlier

deadline.  *See id.*  Similarly, here, Holdings waived the right to invoke the May 17 deadline

because of Zambito's confirmation email stating that she understood the operative deadline to be

May 25.  The subsequent closing checklists memorializing this understanding, and Holdings'

acquiescence are also persuasive evidence that there was a waiver.

## VII.    <u>CONCLUSION</u>

      For the foregoing reasons, the Court finds that South Street timely terminated the MIPA,

and therefore did not breach the MIPA.

On or before 5:00 p.m., December 11, 2019, counsel shall meet and confer addressing any remaining issues in this case relating to Count II of the Complaint and Claim No. 22 filed by South Street.  On or before December 18, 2019, if the parties are unable to resolve the remaining issues, counsel shall file memoranda addressing any future proceedings required to resolve the remaining issues in this case.  The Court will enter a separate order scheduling a case management conference after reviewing the memoranda.

Dated:    November 27, 2019
          New York, New York

                    _____*Martin Glenn*_____
                    MARTIN GLENN
              United States Bankruptcy Judge